IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| NEW DAY PERSONAL CARE SERVICES, INC.; <br>     *Plaintiff*, <br><br>  v. <br><br> JULIE A. SU, Acting Secretary of the United States Department of Labor, in her official capacity; <br><br> JESSICA LOOMAN, Administrator of the Wage and Hour Division, in her official capacity, <br><br>     *Defendants.* | Civil Action No. |

**COMPLAINT FOR VACATUR, AND DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1. Plaintiff New Day Personal Care Services, Inc., seeks an order declaring unlawful and setting aside (1) a United States Department of Labor Final Rule for domestic service employment, *see Application of the Fair Labor Standards Act to Domestic Service*, 78 Fed. Reg. 60,454 (Oct. 1, 2013) ("2013 Rule"), and (2) the Department's assessment of liability for back wages issued against Plaintiff.

2. In the alternative, Plaintiff seeks an order declaring that the Fair Labor Standards Act's extension of overtime to "employee[s] in domestic service," 29 U.S.C. § 207(*l*), exceeds the limited and enumerated powers of the United States Congress under Article I of the U.S. Constitution.

## PARTIES

3. Plaintiff, New Day Personal Care Services, Inc. ("New Day"), is a third-party agency that handles Medicare and Medicaid reimbursement for home care services provided by independent contractors to infirm, elderly, and physically and mentally impaired individuals. Ex. A (Declaration of Robert Doucet) ¶¶4–11.

4. New Day is a Louisiana company with its principal place of business in Lafayette, Louisiana. Ex. A ¶¶4–5.

5. New Day is licensed to and conducts operations only within Louisiana and only in Medicaid Region 4, which includes Lafayette and six other Louisiana Parishes. Ex. A ¶¶4–5.

6. Defendant Julie A. Su is the Acting Secretary of the United States Department of Labor ("DOL"). As Acting Secretary Defendant Su administers and enforces the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA" or "Act"). New Day sues Acting Secretary Su in her official capacity.

7. Defendant Jessica Looman is the Administrator of DOL's Wage and Hour Division. The Administrator of the Wage and Hour Division administers the FLSA and promulgated the regulations at issue in this case. *See* 29 U.S.C. § 204(a). New Day sues Administrator Looman in her official capacity.

## JURISDICTION AND VENUE

8. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).

9. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) and (e)(1) because Defendants are United States agencies or officers sued in their official capacities,

and substantial parts of the events giving rise to New Day's claims occurred in the Western District of Louisiana, where New Day is located and conducts business.

## FACTUAL ALLEGATIONS

I. **Legal Background**

A. **The FLSA's Application to Domestic Service**

10. The FLSA requires that certain employers pay covered employees "not less than one and one-half times the regular rate" for any hours worked beyond 40 hours per week. 29 U.S.C. § 207(a)(1), (*l*). Any violation makes the employer potentially liable for damages, an equal amount in liquidated damages, civil penalties, criminal fines, and imprisonment "for not more than six months." *Id.* § 216(a), (c), (e)(2).

11. The term employer "includes any person acting directly or indirectly in the interest of an employer in relation to an employee." *Id.* § 203(d). This term doesn't follow the common law of agency, but instead follows "economic reality." *United States v. Silk*, 331 U.S. 704, 713 (1947); *see also Bartels v. Birmingham*, 332 U.S. 126, 130 (1947) ("[E]mployees are those who as a matter of economic reality are dependent upon the business to which they render service.").

12. Determining whether someone is an employer as a matter of "economic reality" is difficult. Courts apply a multi-factor test. *See Gray v. Powers*, 673 F.3d 352, 355 (5th Cir. 2012). Over the years, DOL has adopted different views about how to apply the test to independent contractors. *Compare* 89 Fed. Reg. 1,638 (Jan. 10, 2024), *with* 86 Fed. Reg. 1,168 (Jan. 7, 2021).

13. Not only is the definition of "employer" vague—the scope of the FLSA is also broad. Before 1974, the FLSA applied to the employees of enterprises with certain gross annual sales that engaged in commerce or in the production of goods for sale in commerce

across state borders. The Supreme Court upheld the constitutionality of the pre-1974 FLSA in *Maryland v. Wirtz*, 392 U.S. 183 (1968).

14. In 1974, however, Congress further expanded the FLSA to cover "any employee in domestic service in one or more households." 29 U.S.C. § 207(*l*). At the time, this expansion regulated approximately "836,000 households" as employers. S. Rep. No. 93-300, at 115 (1973); *see also* H.R. Rep. No. 93-232, at 95 (1973) ("Do we really want to subject housewives to possible criminal penalties for failure to keep records?").

15. As amended in 1974, the Act covers jobs such as "companions, babysitters, cooks, waiters, butlers, valets, maids, housekeepers, nannies, nurses, janitors, laundresses, caretakers, handymen, gardeners, home health aides, personal care aides, and chauffeurs of automobiles for family use," even if they work for a single household entirely within a state. 29 C.F.R. § 552.3.

16. At the time, some Members of Congress noted that this amendment exceeded the powers of Congress. *See* S. Rep. No. 93-300, at 122 (minority view) ("Quite apart from these practical considerations, however, we believe that an extension of coverage to domestic help is beyond the power of Congress under the commerce clause. If domestic employees who make beds, dust, and wash windows in a private residence are engaged in interstate commerce, there is nothing left of intrastate activities.").

17. To limit the scope of the 1974 Amendments, Congress exempted some employees otherwise engaged in domestic service.

18. First, Congress exempted from overtime pay "casual" babysitters and all employees, casual or not, who "provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined

4

and delimited by regulations of the Secretary [of Labor]).ˮ 29 U.S.C. § 213(a)(15). This is the "Companionship Exemption."

19.    Second, Congress exempted from overtime pay "any employee … who resides in" the household the employee workers. *Id.* § 213(b)(21). This is the "Live-In Exemption."

20.    DOL first interpreted these exemptions in a 1975 Rule codified at 40 Fed. Reg. 7,404 (Feb. 20, 1975) ("1975 Rule").

21.    In this Rule, DOL considered whether the exemption should be available to employers who were covered enterprises before the 1974 Amendments. DOL "concluded that these exemptions can be available to such third party employers since they apply to 'any employee' engaged 'in' the enumerated services. This interpretation is more consistent with the statutory language and prior practices concerning other similarly worded exemptions." *Id.* at 7405.

22.    DOL adhered to this contemporaneous reading of the exemptions for more than 30 years. It is also the best reading of the exemptions. As DOL put it, "[t]he text of the FLSA makes the applicability of the companionship exemption dependent upon the nature of an employee's activities and the place of their performance, without regard to the identity of the employer." *See* Wage and Hour Advisory Mem. No. 2005-1 (Dec. 1, 2005).

23.    In 2007, the Supreme Court held that the Department's 1975 regulation was "valid and binding" as applied to the Companionship Exemption. *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 162 (2007).

**B. Companionship or "Home Care" Services**

24.    As the Nation's elderly population has grown, so has demand for companionship or "home care" services. By 2013, the home care sector supported nearly two million home

5

care providers, 78 Fed. Reg. at 60,458, 60,520, and over six million elderly and infirm individuals needing home care services, *id.* at 60,521.

25. Many home care services are publicly financed through third-party payment programs such as Medicaid. They are provided under federal and state laws and regulations intended to ensure that elderly, infirm, or disabled individuals receive quality care in their homes.

26. For example, in 1981, Congress enacted the "home and community-based services" Medicaid waiver program. 42 U.S.C. § 1396n(c). This waiver program allows States to use federal funds to pay for home care services if they certify that the cost of serving individuals at home would be less than or equal to the cost of institutional care. *Id.* To obtain a waiver, states must provide "assurances" meant to protect the health and welfare of the individuals receiving the services and guard the public fisc against fraud, waste, and abuse. *Id.* § 1396n(c)(2).

27. Congress has since enacted other Medicaid programs meant to encourage "self-directed" or "consumer-controlled" home care. *See id.* §§ 1396n(i)–(k). Under these programs, the "consumer" (i.e., the person receiving the home care services) or a guardian chooses a home care "provider" (i.e., the companions or aides providing services) to provide care. The consumer or guardian controls the provider's day-to-day responsibilities and tasks.

28. Private home care agencies play a critical role in delivering these services. Although the methods of delivering home care services vary by program and state, in general, home care agencies are private third parties that help states administer reimbursements on behalf of consumers, match consumers with eligible home care providers, and oversee compliance with applicable requirements. To maintain

profitability and pay for overhead and other expenses necessary to run a business, home care agencies usually keep a small fraction of the reimbursement for homecare services, and the remainder is used to pay home care providers.

29. As relevant here, Medicaid-funded home care programs reimburse home care services through a fixed hourly rate formula, and do not allow increased rates for overtime. Further, because consumers typically require continuous care throughout the week from the same provider, home care providers often work far in excess of 40 hours a week. Ex. A ¶27.

**C. The 2013 Rule**

30. During his 2008 presidential campaign, President Obama promised the Service Employees International Union that he would extend overtime to home care providers through legislation.

31. After failing to persuade Congress to enact legislation extending overtime pay to home care providers, however, President Obama concluded that "we can't wait for Congress to act." The White House, Press Release, *We Can't Wait* (Dec. 15, 2011), https://perma.cc/H8EM-H3QS.

32. During a "We Can't Wait" event, President Obama announced: "I'm sure many of you won't be surprised to know that Congress hasn't acted on this issue so far. Today, I will." The Obama White House, *President Obama on Ensuring Fair Pay for In-Home Care Workers*, YouTube, at 4:40, 6:08 (Dec. 15, 2011), https://www.youtube.com/watch?v=96mmOuNeWj4. President Obama then endorsed what the White House called DOL's new "law." Matt Compton, *Ensuring Fair Pay for Home Care Workers*, The White House (Dec. 15, 2011), https://perma.cc/F9F6-2P7U.

33. The referenced new "law," of course, was no law at all. Rather, it was the DOL proposal that became the 2013 Rule. Among other things, the 2013 Rule abandoned the longstanding 1975 Rule and replaced it with the very opposite rule: DOL now asserts that third parties "may not avail themselves" of the Companionship or Live-In Exemptions, unless the third parties are also members of the same "family or household." 29 C.F.R. § 552.109(a), (c). By nullifying these exemptions, DOL asserted that traditionally exempt home care services administered by third parties could now be covered by the FLSA's overtime requirements.

34. The 2013 Rule also gutted the Companionship Exemption by excluding from the exemption all employes who provide "care"—as opposed to "fellowship" and "protection"—unless extensive documentation proves the "care" was purely incidental and comprised no more than one-fifth of total hours worked. *Id*. § 552.6(b). The permissible "fellowship" activities under the Rule include "watching television together; visiting with friends and neighbors; taking walks; playing cards, or engaging in hobbies." 78 Fed. Reg. at 60,464. They do not include providing "*care*" for the infirm or the elderly by bathing them, dressing them, helping them go to the bathroom, or anything else these individuals desperately need, unless employees offset each hour of care with, say, four hours of television—and keep meticulous records in the process. 29 C.F.R. § 552.6(b) (emphasis added).

35. By design, this makes it virtually impossible for home care providers to qualify under the Companionship Exemption. As DOL admits, most home care providers routinely help with tasks of daily living, and not just incidentally. 78 Fed. Reg. at 60,521. DOL was therefore effectively nullifying an exemption Congress enacted to help and protect those "unable to care for themselves." 29 U.S.C. § 213(a)(15). As DOL explained,

8

under its definition of "companionship services," a father who enrolls in a state Medicaid waiver program to continuously care for an "adult, physically disabled son," "would not fall under the companionship services exemption." 78 Fed. Reg. at 60,488. Third-party agencies that attempt to help that father obtain funding to take care of a disabled child would risk crushing liability under the FLSA.

36. According to DOL, the 2013 Rule subjected roughly 90% of home health and personal care aides—about two million home care providers, and more than 10,000 businesses, agencies, states, and countless individuals—to the restrictions of the FLSA, all without Congress lifting a finger. *See id.* at 60,519–20.

37. Commenters warned DOL at the time that the Rule would be unworkable. The Rule would "undermine Medicaid's" home care programs, "which rely on agencies to assist consumers who are not capable of being solely responsible for managing a direct care worker's employment." *Id.* at 60,481. Further, "the costs of care would far exceed those Medicaid will reimburse." *Id.* at 60,487. Agencies would respond by capping hours to 40 hours per week. This would make it harder for home care providers to earn a living, harming continuity and quality of care. *Id.* at 60,487, 60,543–44.

**D. The Rule's Effect**

38. As predicted, the effect of the 2013 Rule has been to reduce the supply and quality of care.

39. The Government Accountability Office found that following the 2013 Rule, states "restricted home care workers' hours to limit overtime costs in their Medicaid programs in response to the [2013] Rule." *See* U.S. Gov't Accountability Off., GAO-21-72, *Observations on the Effects of the Home Care Rule* 13 (Oct. 19, 2020), https://www.gao.gov/products/gao-21-72. Some states cut entire home care programs,

9

such as programs "for 24/7 live-in care," recognizing that "workers would have exceeded 40 hours by the second day of the week." *Id.* at 15. Agencies "capped their workers' weekly hours to limit overtime … because they have limited funding and consumers cannot afford price increases to cover those costs." *Id.* at 16. Private agencies cut "services." *Id.* And "Medicaid reimbursement rates" limited continuity of care for the elderly and infirm. *Id.* at 21.

40.  This has done nothing to increase the wages of home care providers. "[H]ome care workers were less likely to work overtime following implementation" of the 2013 Rule "when compared to occupations with similar entry requirements." *Id.* at 18. But despite cuts in hours, wages "did not significantly increase," *id.*, and "weekly earnings did not change significantly" compared to similar jobs, *id.* at 20 & fig. 3 (Estimated Median Weekly Earnings of Employed Workers, 2010 through 2019) (*infra*).



## II. Factual Background

### A. New Day's Business

41. New Day's home care providers are engaged and paid as 1099 contractors pursuant to independent contractor agreements between New Day and each home care provider. New Day home care providers are paid an agreed hourly rate and are not paid overtime for hours worked beyond 40 hours per week. Ex. A ¶7.

42. New Day home care providers provide companionship services at the homes of New Day clients. These services include general companionship, assisting the client with dressing, grooming, and eating, and may include limited assistance with housekeeping tasks. Ex. A ¶8.

43. Before the 2013 Rule, these home care providers would have been exempt from overtime under the Companionship Exemption. But DOL's 2013 Rule excludes third-party agencies from that exemption and narrowly defines "companionship services" to exclude help with daily life activities. That would prevent New Day from invoking the exemption in enforcement proceedings. Ex. A ¶35.

44. New Day also offers live-in companionship services and markets these services to the public. New Day would be encouraged to continue to market these services if the Live-In Exemption were interpreted to cover third-party agencies such as New Day, as it was before 2013. Ex. A ¶35.

45. New Day cannot afford to pay home care providers time-and-a-half overtime and remain in business because the effective hourly wage rate would exceed the maximum reimbursement rates available under the Medicare and Medicaid programs New Day administers. Ex. A ¶¶21–28.

46. Nor can New Day provide home care services without providers working more than 40 hours per week because clients need consistent care from the same provider. Ex. A ¶27.

### B. DOL's Threatened Enforcement Action Against New Day

47. In February 2024, a DOL investigator contacted New Day and New Day provided all requested information, including pay records for its home care providers. Ex. A ¶12.

48. On June 4, 2024, Wage and Hour Division District Director Troy Mouton informed New Day that it had been assessed $923,960.40 of back wages for overtime pay spanning a two-year audit period of February 9, 2022, through February 9, 2024. Ex. A ¶¶13–14.

49. Mouton provided a WH-56 Form (Final Assessment) that included the computation of the back wages that DOL demanded New Day pay to the home care providers and advised New Day that it needed to begin paying all home care providers overtime wages. Ex. A ¶¶15, 17 & Attachment 1 (Final Assessment).

50. New Day disagreed with DOL's Final Assessment and retained counsel. Ex. A ¶¶18, 29.

51. By November 2024, New Day home care providers were receiving frequent phone calls from DOL including at night and on weekends. Ex. A ¶36.

52. On November 14, 2024, DOL informed New Day that the frequent calls to home care providers were part of an information gathering effort that the DOL Solicitor requested in preparation for filing a potential enforcement action against New Day. Ex. A ¶38.

53. The Final Assessment and the impending enforcement proceedings would make it impossible for New Day to remain in business, harming New Day, its providers, and its

customers. New Day therefore brings this pre-enforcement claim to clarify its rights and obligations under the FLSA.

## CLAIMS FOR RELIEF

### COUNT I
### (APA Violation: In Excess of Statutory Authority)

54. The allegations in each of the preceding paragraphs are expressly incorporated herein as if restated in full.

55. Under the APA, a court must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

56. The 2013 Rule is a final agency action. *Id.* § 704.

57. The 2013 Rule unlawfully denies the Companionship and Live-In Exemptions to third-party agencies. This denial exceeds DOL's statutory authority because it conflicts with the FLSA's imperative that its overtime provisions do not apply to "any employee employed … to provide companionship services," 29 U.S.C. § 213(a)(15), and "any employee who is employed in domestic service in a household and who resides in such household," *id.* § 213(a)(21).

58. The 2013 Rule amends 29 C.F.R. § 552.6 to give an artificially constraining definition of "companionship services" that excludes help with daily activities, such as "dressing, grooming, feeding, bathing, toileting, and transferring," unless these activities are purely incidental, and the employer proves it by keeping meticulous records. 78 Fed. Reg. at 60,557. This definition exceeds DOL's statutory authority because it undermines Congress's core purpose for writing the Companionship Exemption into the FLSA: keeping the elderly and infirm in their homes though affordable care that is not subject to the Act. This is the only logical purpose for drafting a carve-out that benefits those "who

13

(because of age or infirmity) are unable to care for themselves." 29 U.S.C. § 213(a)(15). This text does not authorize DOL to define "companionship services" in a manner that excludes care for the unique needs of the old and infirm.

59. DOL's Final Assessment is also "final agency action" subject to judicial review under 5 U.S.C. § 704 because it "mark[s] the consummation of the agency's decisionmaking process and "determined" "rights or obligations ... from which legal consequences will flow," and no other adequate legal remedy exists. *Walsh v. Massonti Home Care LLC*, No. 4:20-CV-988 RLW, 2021 WL 4459735, at *3 (E.D. Mo. Sept. 29, 2021) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). The Final Assessment consummates the decisionmaking process because it shows that "DOL concluded its investigation" with the determination that Plaintiff must classify its home care providers as employees and pay them back wages and overtime. *Id*. The Final Assessment determines legal rights and obligations from which legal consequences flow because it assesses back wages, causes additional back wages to accrue continuously, and exposes Plaintiff to other damages and penalties for willfully operating its business in violation of the FLSA going forward. *Id*. No other adequate legal remedy exists because Plaintiff's defense against an enforcement action would not "prevent the harm [to Plaintiff] of ongoing exposure to civil money penalties and additional damages by operating its business as it previously did." *Id*. at *4.

60. Regardless of whether it is a final agency action, DOL's Final Assessment is a new legal wrong and adversely affects New Day, 5 U.S.C. § 702, entitling New Day to judicial review of the 2013 Rule.

61. DOL exceeded its statutory authority by issuing a Final Assessment to Plaintiff pursuant to the invalid 2013 Rule.

## COUNT II
## (Ultra Vires Doctrine)

62. The allegations in each of the preceding paragraphs are expressly incorporated herein as if restated in full.

63. A plaintiff may "institute a non-statutory review action" against an agency head "for allegedly exceeding his statutory authority." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327–28 (D.C. Cir. 1996).

64. Congress prohibited DOL from extending FLSA coverage to "any employee who is employed in domestic service in a household and who resides in such household," 29 U.S.C. § 213(b)(21), and gave DOL no authority to define or delimit those terms, *id*. By extending FLSA overtime coverage to live-in home care providers who are staffed through third-party agencies, 29 C.F.R. § 552.109(c), DOL exceeded its statutory authority in promulgating the 2013 Rule.

65. Congress also prohibited DOL from extending FLSA coverage to "any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary)." 29 U.S.C. § 213(a)(15). By extending FLSA overtime coverage to third-party agencies that employ companionship services providers, 29 C.F.R. § 552.109(a), DOL acted outside of its statutory authority in promulgating the 2013 Rule.

66. The 2013 Rule also exceeds DOL's statutory authority by defining "companionship services" so narrowly that it subverts Congress's intent for the Companionship Exemption to benefit those "who (because of age or infirmity) are unable to care for themselves." 29 U.S.C. § 213(a)(15). The new definition excludes help with daily

activities such as "dressing, grooming, feeding, bathing, toileting, and transferring," unless these activities are purely incidental, and the employers prove it by keeping meticulous records. 78 Fed. Reg. at 60,557 (29 C.F.R. § 552.6). Congress did not authorize DOL to largely nullify the companionship exemption by definitional artistry.

67. DOL has issued a Final Assessment concluding that Plaintiff is an "employer" subject to the FLSA, assessing Plaintiff $923,960.40 of back wages, and requiring Plaintiff to pay overtime to all home care providers prospectively. Ex. A. ¶¶14–15, 17, 30, 38 & Attachment 1.

68. DOL has exceeded its statutory authority by issuing a Final Assessment to Plaintiff pursuant to the invalid 2013 Rule.

69. Plaintiff faces a threat of immediate enforcement proceedings making this claim for pre-enforcement relief ripe for adjudication.

## COUNT III
### (Enumerated Powers Violation)

70. The allegations in each of the preceding paragraphs are expressly incorporated herein as if restated in full.

71. Congress lacks power to regulate the wages of entirely intrastate domestic service employees. Those employees are not engaged in "Commerce with foreign Nations … among the several States, [or] with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. Congress's interstate commerce power allows it to regulate "the channels of interstate commerce," "the instrumentalities of interstate commerce, or persons or things in interstate commerce," and "those activities having a substantial relation to interstate commerce." *United States v. Lopez*, 514 U.S. 549, 558–59 (1995). Activity fits the third category only if it "'substantially affects' interstate commerce." *Id*. at 559. And although

activity's "aggregate effect on interstate commerce" is relevant, *United States v. Morrison*, 529 U.S. 598, 617 (2000), a "but-for causal chain from the initial" activity "to every attenuated effect upon interstate commerce" is not enough to show that the activity's effect is "substantial," *id.* at 615.

72. In the 1974 amendments, Congress expanded the scope of the FLSA, applying it to any employee in domestic service, regardless of the employee's connection to interstate commerce. 29 U.S.C. §§ 206(f), 207(*l*).

73. Congress's finding of a connection to interstate commerce was the following:

> Congress in section 2(a) of the Act specifically found that the employment of persons in domestic service in households affects commerce. In the legislative history it was pointed out that employees in domestic service employment handle goods such as soaps, mops, detergents, and vacuum cleaners that have moved in or were produced for interstate commerce and also that they free members of the household to themselves to engage in activities in interstate commerce.

29 C.F.R. § 552.99 (citing S. Rep. No. 93-690, at 21–22 (1974)).

74. This connection is not "substantial," but tenuous. Employees in domestic service are beyond Congress's Commerce Clause power because they are not engaged in interstate commerce, and their services do not "substantially affect" interstate commerce. No employment could be less interstate than domestic service in a household entirely within a state's borders. Because the Constitution leaves regulation of local and family matters primarily to the states, *Morrison*, 529 U.S. at 615–16, Congress's commerce power does not reach wages for domestic services simply because those workers sometimes happen to use vacuum cleaners or other goods shipped at some point in the past in interstate commerce.

## COUNT IV
## (Declaratory Judgment)

75.     The allegations in each of the preceding paragraphs are expressly incorporated herein as if restated in full.

76.     The Declaratory Judgment Act authorizes "any court of the United States" to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

77.     For the same reasons described in each of the previous counts, Plaintiff is entitled to a declaratory judgment that the 2013 Rule, or at least 29 C.F.R. §§ 552.109(a), (c), and 552.6, as well as the Final Assessment that DOL issued Plaintiff, are ultra vires, and otherwise not in accordance with law, in excess of statutory authority. Further, Plaintiff is entitled to a declaration that 29 U.S.C. §§ 206(f) and 207(*l*) exceed the enumerated powers of Congress.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court:

A. Hold unlawful and set aside (that is, vacate) the (1) 2013 Rule and (2) the Final Assessment;

B. Issue a declaration that the 2013 Rule and Final Assessment are ultra vires, and otherwise not in accordance with law, or in excess of statutory authority;

C. Issue a declaration that the FLSA's coverage of "employees in domestic service" exceeds the enumerated powers of Congress. 29 U.S.C. § 207(*l*);

D. Permanently enjoin all Defendants from asserting the 2013 Rule and the Final Assessment against Plaintiff in any enforcement proceeding;

E. Permanently enjoin all Defendants from enforcing 29 U.S.C. § 207(*l*);

F. Award reasonable attorneys' fees and allowable costs, including under the Equal Access to Justice Act; and

G. Grant Plaintiff all other relief that this Court deems appropriate.

Dated: January 17, 2025                        Respectfully Submitted,

| | |
|---|---|
| Jonathan Berry* | *s/David M. Whitaker* |
| Michael Buschbacher* | **DAVID M. WHITAKER (#21149)** |
| James R. Conde* | Email: david.whitaker@keanmiller.com |
| BOYDEN GRAY PLLC | **ZOE W. VERMEULEN (#34804)** |
| 800 Connecticut Ave. NW, | Email: zoe.vermeulen@keanmiller.com |
| Suite 900 | KEAN MILLER LLP |
| Washington, DC 20006 | 909 Poydras Street, Suite 3600 |
| (202) 955-0620 | New Orleans, LA 70112 |
| jberry@boydengray.com | Telephone: (504) 585-3050 |
| mbuscbacher@boydengray.com | Facsimile: (504) 585-3051 |
| jconde@boydengray.com | **Counsel for Plaintiff** |
| | New Day Personal Care Services, Inc. |

*\* Pro hac vice applications forthcoming*